IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Civil Case No. 1:25-cv-25323-RAR

SHARKNINJA OPERATING LLC, and SHARKNINJA SALES COMPANY,

*Plaintiffs*,

v.

THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A,

*Defendants*.

## DECLARATION OF DANIELLE LESSING

I, Danielle Lessing, declare and state as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I make this declaration in support of SharkNinja Operating LLC and SharkNinja Sales Company's ("SharkNinja") Motion for Entry of a Temporary Restraining Order, including temporary restraints and other relief.

3. I am SVP, Chief Roadmap & Innovation Officer at SharkNinja Operating LLC, and am knowledgeable about or have access to business records concerning key aspects of SharkNinja's brand protection operations, including, but not limited to, trademarks, copyrights, patents and other intellectual property, sales, online sales, advertising, marketing, media coverage,

and associated international operations. I make this declaration from matters within my own knowledge unless stated otherwise.

4. SharkNinja is the owner of all rights, title, and interest in and to U.S. Patent Nos. 12,285,028 (the "'028 Patent" or the "Utility Patent") and D1,091,236 (the "'236 Design Patent" or the "Design Patent"). Collectively, the Utility Patent and the Design Patent are referred to as the "SharkNinja Patents." True and correct copies of the SharkNinja Patents are attached hereto as Exhibits 1 and 2.

5. SharkNinja is a global product design and technology leader recognized for consistently redefining consumer experiences through disruptive innovation and bold design. It offers more than 20 categories of home appliance products, including floorcare products, environmental products (such as fans and purifiers), kitchen appliances, and—relevant to this case—frozen food and beverage makers and systems. SharkNinja has earned an international reputation for quality, reliability, and value. It is the exclusive supplier and manufacturer of Shark and Ninja brand products in the United States.

6. Following the viral success of its CREAMi home ice-cream machine, SharkNinja identified another clear unmet need in the home appliance market: a true at-home slush machine that did not rely on pre-frozen ice, delivered a consistent slush texture across a wide range of beverages, and was sized for everyday countertop use. After months of cross-functional R&D, SharkNinja developed the first compact, at-home, countertop-worthy slush machine that delivers consistent texture without pre-frozen ice to serve an unmet need in the market—the SLUSHi. Prior to the Ninja SLUSHi, consumers were limited to blender-based ice drinks or ice-cream-maker analogs that were slow, messy, bulky, noisy, and inconsistent.

7. Designed with the home consumer in mind, SLUSHi operates in just a few steps: Consumers fill the vessel with sugar-containing liquid, select a preset program, and have a frozen drink in as little as 15 minutes.

8. To make this vision a reality, beginning in late 2022, SharkNinja assembled a cross-functional team of industrial designers, engineers, food scientists, and market researchers to close this gap. SharkNinja sought a compact, countertop-worthy design that could be easily transported and fit beneath standard kitchen cabinets. Achieving commercial-grade performance in a small kitchen footprint required novel arrangements of the compressor, condenser, and airflow; carefully tuned dasher speeds and geometries; a specialized vessel design to direct flow and ensure uniform dispensing; and intuitive, preset temperature programs validated through extensive culinary testing. These elements—developed at significant cost and safeguarded as patented and proprietary—are what transform the idea of a home slush machine into a compact, countertop-worthy, and user-friendly appliance.

9. In particular, SharkNinja's engineers underwent significant testing to tackle the challenge of implementing what is typically a large footprint compressor unit into a consumer device appropriate for home kitchen use. The engineers developed a unique vessel geometry: a mixing vessel with at least one curved sidewall forming a partly cylindrical chamber for the drink product. The chamber incorporates an asymmetric wall portion including a side baffle that promotes slush circulation, helping sticky slush release from the "roof" and recirculate and ensuring proper ice texture within the slush. This geometry encourages a cyclonic flow path, reduces waste, and delivers consistent dispensing while preserving the product's compact, countertop-worthy, and cohesive, pill-shaped design aesthetic.

10. Likewise, SharkNinja's team developed a removable tray that allows the user to easily dispose of excess slush while providing an overall clean look on the face of the machine. To make that possible, the tray's ample width and gentle curvature create the perfect clearance needed to sweep excess and sticky fluids away in a single horizontal motion, all while preserving the product's lightweight, pill-shaped design. Because the circular drum nests within the pill-shaped vessel, the tray echoes that geometry: The lower curve provides the necessary tray volume, with the space on the side corners efficiently packaging the electronics. This effort—refining every millimeter of the front face and placing hand touchpoints ergonomically—ensures the unit remains compact, countertop-worthy, and easy to clean and maintain.

11. Over roughly 18 months, the team progressed through multiple proof-of-concept builds and engineering iterations, migrated from early thermoelectric concepts to a compact, compressor-based cooling architecture, and refined key subsystems—including evaporator geometry, vessel design, dasher (the rotating mixer element within the vessel) speed and profile, preset temperature programs, and user safety and cleaning features. This intensive program required substantial financial outlays and deep technical know-how, culminating in a first-of-its-kind, compact, countertop-worthy, and user-friendly device that achieves rapid slush formation without ice, maintains a sleek design suitable for under-cabinet placement, and is easy to maintain and operate.

12. The success of Ninja SLUSHi has resulted in numerous products that infringe the SharkNinja Patents and other intellectual property rights in the market. Imitators did not independently develop or invest in solving these engineering challenges; they simply leveraged SharkNinja's innovations to field knockoffs. Consequently, SharkNinja has implemented an anti-infringement program and is investigating suspicious websites and online marketplace listings

4

identified in proactive internet sweeps conducted as part of that program. SharkNinja has identified numerous domain names linked to fully interactive websites and marketplace listings ("Marketplace Platforms").

13. SharkNinja's investigation has revealed that Defendants are selling—including on the Marketplace Platforms—products that infringe at least one SharkNinja Patent. I understand, from Schedule A to the Complaint, that Defendants' products infringe the SharkNinja Patents (the "Infringing Products").

14. The Defendants' online marketplace pages on the Marketplace Platforms, identified on Schedule A to the Complaint (the "Internet Stores"), share unique identifiers—such as design elements and similarities of the Infringing Products offered for sale—that establish a logical relationship between them and suggest that Defendants' illegal operations arise out of the same transaction, occurrence, or series of transactions or occurrences.

15. Despite SharkNinja's enforcement efforts, Defendants have persisted in creating those Internet Stores and engaging in continued sales of the Infringing Products. In addition, the volume and rate at which new Infringing Products continue to appear have far exceeded SharkNinja's expectations to address through marketplace IP enforcement.

16. For example, to date, SharkNinja's investigation has revealed a significant number of Defendants are using their Internet Stores to sell Infringing Products from foreign countries such as China (and elsewhere) to consumers in the U.S., including consumers in Florida.

17. I understand that SharkNinja's legal team has analyzed each of the Defendants' Internet Stores and determined that Infringing Products are being offered for sale to consumers in the United States, including within this Judicial District.

18. This conclusion was reached through a visual inspection of the products listed in the Internet Stores. We confirmed that:

    a. The Infringing Products infringe at least one of the SharkNinja Patents;

    b. Each Defendant Internet Store accepts payment in U.S. dollars; and

    c. Each Defendant allows Infringing Products to be shipped to the Southern District of Florida.

19. True and correct copies of representative screenshot printouts from the Defendants' Internet Stores, as well as pages confirming the ability to order and ship Infringing Products to Florida, are collectively attached as Exhibit 3. More specifically, Exhibit 3[1] also contains proof of offers for sale accessible to consumers in the Southern District of Florida that can be shipped to the Southern District of Florida.

20. I also understand that we confirmed that Defendants' seller names (identified on Schedule A to the Complaint) are not associated with any registered business. Moreover, most Defendants fail to disclose accurate and complete contact information on the Marketplace Platforms.

21. To the best of our knowledge, Defendants and their websites do not conduct business with SharkNinja and do not have the right or authority to use the SharkNinja Patents for any reason. We have no reason to believe that any of the Defendants are authorized resellers of any genuine SharkNinja Products. SharkNinja has not licensed or authorized Defendants to use

---

[1] Due to the number of Defendants identified in Schedule A to the Complaint, the attached Exhibit 3 does not set forth all the evidence gathered for each Defendant. The declarant nonetheless certifies that similar evidence was obtained and reviewed for each and every Defendant identified in Schedule A. Complete copies of screenshots for each and every Defendant can be provided to the Court under seal upon request.

the SharkNinja Patents, and none of the Defendants is an authorized retailer of genuine Shark and Ninja brand products.

22. Upon information and belief, sellers like the Defendants in this case regularly rely on and use the e-mail addresses they provide to the Marketplace Platforms and other third-party payment processors in order to communicate concerning monies received through the Defendants' Internet Stores. Thus, obtaining such e-mail addresses from the Marketplace Platforms or third-party payment processors is often the fastest and most direct way to get into contact with individuals and entities like the Defendants that are engaged in the sale of Infringing Products.

23. Infringers are free-riding on SharkNinja's breakthrough inventions, exploiting the time, capital, and risk SharkNinja invested to create this new product. By piggybacking on SharkNinja's Patents—rather than undertaking the years of engineering and testing required to make a compact, countertop-worthy, and user-friendly slush machine viable—these imitators capture sales that would otherwise accrue to SharkNinja, dilute hard-won market share, erode the premium that reflects the product's innovation, increase the risk of poor product quality, and diminish consumer confidence. Moreover, these imitators erode SharkNinja's hard-fought brand equity, earned through a viral product launch and marketing investment intended to make Ninja SLUSHi virtually synonymous with a product of this type. The infringers are using SharkNinja's Patents in a market that SharkNinja itself created through groundbreaking inventions and ideas, and their conduct depletes that market and unfairly appropriates the economic returns necessary to sustain—and reward—groundbreaking innovation.

24. Monetary damages alone cannot adequately compensate SharkNinja for the ongoing infringement because monetary damages fail to address the loss of control over, and harm to, SharkNinja's reputation and goodwill. The harm is already manifest and increasingly

concerning: Despite significant engagement on social media, conversion to sales has started to lag, likely due to diversion to infringing look-alikes. Furthermore, monetary damages are difficult, if not impossible, to completely ascertain due to the inability to fully quantify the harm to SharkNinja's reputation and goodwill caused by acts of infringement.

25.     SharkNinja turns unmet consumer needs into new markets through viral, category-creating launches, where the fleeting launch window and first-mover brand equity are irretrievable and not compensable by money damages alone. Each launch is anchored by a fun, highly demonstrable product story that prompts organic first-use sharing, which SharkNinja amplifies with significant paid social investment to create a reinforcing flywheel of organic and paid content driving conversion and sales velocity. This approach rapidly builds brand equity and cements SharkNinja as the original in the categories it pioneers—illustrated by the Ninja CREAMi, Ninja Foodi pressure cooker, and Ninja Crispi glass air fryer—and supports successful second- and third-generation follow-ons. Because the viral window is brief and non-repeatable, an infringer's presence immediately siphons network effects, accelerates confusion, erodes price, and permanently dilutes SharkNinja's first-mover advantage—injuries that are difficult to quantify and impossible to unwind. A temporary restraining order is therefore necessary to preserve the status quo during this holiday season and prevent further irreparable harm while the merits are adjudicated.

26.     SharkNinja's long-term goodwill and reputation as "the original" in a new category are irreparably harmed when the SharkNinja Patents are infringed by goods not authorized, produced, or manufactured by SharkNinja. Moreover, consumer brand confidence is damaged, especially where SharkNinja's social-media strategy depends on consumers' continued trust in the

genuine SharkNinja product, understanding its ease of use and cleaning, and recognizing SharkNinja as the source.

27.  Early indicators show that, compared to prior category-defining launches (e.g., CREAMi), SLUSHi is not maintaining its expected share and risks no longer being synonymous with the compact, countertop-worthy slush machine, reimagined for home use in consumers' minds. To regain and preserve its viral brand equity—and to avoid lasting damage from this year's influx of imitators—SharkNinja must reestablish relative exclusivity for this holiday season. For a viral product like Ninja SLUSHi, SharkNinja would expect a disproportionate amount of its annual sales to fall in the holiday season. Over the next seven weeks, we would normally expect roughly a third of our annual sales, with the two weeks following Thanksgiving being especially critical. This is only Ninja SLUSHi's second holiday season and likely our last opportunity to cement our product as the original in this category.

28.  The extent of harm to SharkNinja's reputation and goodwill and the possible diversion of customers due to loss in brand confidence are largely unquantifiable.

29.  SharkNinja will be irreparably harmed by the unauthorized use of the SharkNinja Patents in the upcoming holiday season because the sellers of the Infringing Products take away SharkNinja's ability to control the nature and quality of products embodying the designs depicted in its patents. Loss of quality control over goods comprising the Infringing Products and, in turn, loss of control over our reputation will be neither calculable nor precisely compensable.

30.  SharkNinja will also be irreparably harmed due to a loss of exclusivity. SharkNinja's products are meant to be innovative and exclusive. SharkNinja's extensive marketing and distribution of SharkNinja products, as part of its various marketing activities, are aimed at growing and sustaining sales of SharkNinja products. The designs embodying

9

SharkNinja Patents make it possible to have a compact, countertop-worthy, and user-friendly slush machine for home use. Infringers are using SharkNinja's Patents to compete in the very market that SharkNinja created and that relies on these patented innovations to function as intended. When sellers of Infringing Products use any of the SharkNinja Patents without SharkNinja's authorization, the exclusivity of SharkNinja's products, as well as SharkNinja's reputation, are damaged and eroded, resulting in a loss of unquantifiable future sales.

31. SharkNinja will suffer immediate and irreparable injury, loss, or damage if an *ex parte* temporary restraining order is not issued. Timely injunctive relief is critical to prevent further erosion of market share and brand equity—especially during the upcoming holiday season, a pivotal window for reconnecting consumers with the originality of Ninja SLUSHi. Without timely injunctive relief, infringers will continue to free-ride on SharkNinja's hard-won ideas and Patents, diminishing the durable brand recognition that SharkNinja has invested significantly to build.

I declare under penalty of perjury under the laws of the United States of America the foregoing is true and correct.

Executed on November 18, 2025 in Brookline, Massachusetts.

Signed by:
*Danielle Lessing*
9C063C994F7E4E2...
Danielle Lessing,
SVP, Chief Roadmap & Innovation Officer