# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## MIAMI DIVISION

### CASE NO. 25-cv-25323-RAR

SHARKNINJA OPERATING LLC, and
SHARKNINJA SALES COMPANY,

       Plaintiffs,

v.

THE INDIVIDUALS, CORPORATIONS, LIMITED
LIABILITY COMPANIES, PARTNERSHIPS, AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE A,

       Defendants.

_____/

### PLAINTIFFS' OMNIBUS REPLY IN SUPPORT OF THE MOTION FOR ENTRY OF PRELIMINARY INJUNCTION

Plaintiffs SharkNinja Operating LLC and SharkNinja Sales Company (collectively, "SharkNinja" or "Plaintiffs") hereby submit this Reply in further support of SharkNinja's Motion for Entry of Preliminary Injunction [ECF No. 37].[1]

---

[1] As directed by the Court, this brief also responds to arguments raised by the Expedited Motion to Opposition to Plaintiffs' Motion For Preliminary Injunction [ECF No. 146] filed by the "Xu Defendants," the Opposition to Plaintiffs' Motion for Entry of Preliminary Injunction [ECF Nos. 70 and 151] filed by the "Heim Defendants," the Limited Opposition to Plaintiffs' Motion for Entry of Preliminary Injunction [ECF No. 73] filed by the "Liu Defendants," the Response, Amended Response, and Second Amended Response in Opposition to Plaintiffs' Motion for Preliminary Injunction [ECF Nos. 63, 78, 109], and Motion to Dismiss Plaintiffs' Complaint [ECF No. 129] filed by the "Love Defendants," the Motion to Dismiss [ECF No. 133] and the Opposition to Preliminary Injunction and Motion to Dismiss [ECF No. 138] filed by Defendant Diginavi E-Link (Hong Kong) Limited, the Oppositions to Plaintiffs' Motion for Preliminary Injunction [ECF Nos. 134, 135, 136, 137] filed by Defendants Bluebow, Deaprull, SOZT, and Valieta, the Motion to Dismiss Plaintiffs' Complaint [ECF No. 139] filed by the "Xu Defendants," and the Opposition to Plaintiffs' Motion for Entry of Preliminary Injunction [ECF No. 150] filed by the "Farco Defendants." "Glacier Defendants" and Heim Defendants raise the issue of joinder [ECF Nos. 80 and 151]; SharkNinja contends that joinder issue is not relevant to Preliminary Injunction and will address the joinder issue separately.

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.    ARGUMENT ..................................................................................................... 4

    A.   The Four Factors That Warranted Entry of a TRO Continue to Favor Entry of a Preliminary Injunction ................................................................................ 4

        1.   SharkNinja has Shown Likelihood of Success on the Merits ............................ 5

            a)SharkNinja is Likely to Prevail on the D236 Patent ............................................ 6

            b)SharkNinja is Likely to Prevail on the '028 Patent ........................................... 15

        2.   SharkNinja Will Suffer Irreparable Harm in the Absence of Preliminary Injunction ................................................................................................ 22

            a)SharkNinja Suffers From Irreparable Harm to Its Business And Brand ........... 22

            b)Harm Is Irreparable Because Monetary Judgment Will Be Uncollectible ........ 25

            c)The Irreparable Harm Is Being Caused By Defendants' Infringing Acts .......... 26

        3.   The Balance of Hardship Tips Sharply in SharkNinja's Favor ........................ 27

        4.   Issuance of the Injunction is in the Public Interest ........................................... 28

    B.   The Equitable Relief Sought is Appropriate ............................................................. 29

        1.   The Preliminary Injunction Should Continue to Enjoin Defendants' Unauthorized and Unlawful Infringement of the SharkNinja Patents ................... 29

    C.   The Posted Bond is Sufficient to Secure the Injunction ....................................... 30

    D.   Alternate Service is Appropriate ............................................................................. 30

    E.   This Court Has Personal Jurisdiction Over Each Defendant ................................. 32

III.    CONCLUSION ............................................................................................................... 35

<u>**MEMORANDUM OF LAW**</u>

**I.      <u>INTRODUCTION</u>**

SharkNinja demonstrated in its motion that a preliminary injunction should be granted in this case to prevent further irreparable harm from widespread infringement by dozens of knockoff products.  Defendants' scattershot arguments in response do nothing to change the incontrovertible facts of this case: SharkNinja spent tens of millions of dollars developing and introducing a brand new product category called the Ninja SLUSHi—the first home slushie maker that fits under a kitchen cabinet, does not require ice, and actually makes and mixes a quality frozen drink.  After the unprecedented success of this product, a tsunami of knockoffs appeared overnight—including those of Defendants—that are virtually indistinguishable from the SLUSHi.  A cursory search on Amazon for Ninja SLUSHi reveals exactly the problem Defendants have created: over a hundred virtually indistinguishable knockoffs appear in the search results.  These knockoffs infringe SharkNinja's intellectual property, including the two asserted patents,[2] forcing SharkNinja to literally compete against its own technology.

The harm from Defendants' rampant infringement can never be fully compensated by a damages award.  Already, the uniqueness of the SLUSHi as a product category has begun to evaporate.  Unlike SharkNinja's other viral success stories—like the Foodi and CREAMi, which were not beset by a wave of cheap knockoffs and thus enjoy strong brand recognition and goodwill—the Ninja SLUSHi is becoming commoditized.  Another year and a half of rampant infringement during this case will dilute the brand entirely, beyond recovery.  There is no way to accurately or fully measure the damage that will result.  SharkNinja provided the declaration of

---

[2] U.S. Patent Nos. 12,285,028 (the "'028 Patent" or the "Utility Patent") and D1,091,236 (the "D236 Design Patent" or the "Design Patent") (collectively, the "SharkNinja Patents" or "Asserted Patents").

Danielle Lessing ("Lessing Decl.") to explain this unique and irreparable injury.  Moreover, if SharkNinja is denied an injunction and litigates for a year and a half and wins a substantial judgment, that judgment will be a pyrrhic victory, since the Defendants have no presence or assets in the United States, making any judgment virtually uncollectible.  The result of permitting these Defendants to continue to infringe through the pendency of this case will be that the Ninja SLUSHi brand will have been eviscerated and SharkNinja will have no recourse.  This motion represents SharkNinja's plea for the Court to use its equitable powers to prevent this result.

The same findings that led the Court to enter the TRO [ECF No. 26] warrant entry of a preliminary injunction pending a final determination on the merits.  The Court found, based upon SharkNinja's evidence, that each Defendant's products are likely to infringe at least one SharkNinja Patent.  Defendants' arguments in response do nothing to change that conclusion.  With respect to the D236 Patent, infringement is straightforward.  The distinctive "smiley-face" design of the SLUSHi drip tray is carbon-copied by each of Defendants' products.  It is clear to any ordinary observer from the accused products that Defendants have chosen the same clean, curved look to the drip condensation tray.  While the tray itself has functionality, it is the design choice—embodied in the D236 patent and copied by Defendants—that gives the machine its warm, inviting and crisp look in the compact package of the SLUSHi.  Moreover, none of the weak prior art Defendants cobble together overcomes the strong presumption that the D236 patent is valid.

Infringement of the '028 Patent is equally evident to the naked eye.  The key feature of claim 1—an asymmetric wall on the mixing vessel that includes a side baffle to promote slush flow back into the center—is visually apparent in all of the Defendants' products accused of infringing that patent.  Indeed, none of the Defendants seriously dispute the presence of that limitation.  Instead, they complain about requiring additional evidence of infringement, requiring

expert testimony and needing claim construction.  But none of that is required at this stage to evaluate the *likelihood* of success on the merits.  Indeed, Courts routinely assess and grant preliminary injunctions without full-blown discovery, expert testimony or claim construction. *Outside the Box Innovs., LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1302 (Fed. Cir. 2012) ("motions for a preliminary injunction may come for decision before significant discovery has occurred"); *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1403 (Fed. Cir. 2022) ("generally, expert testimony is not required at the preliminary injunction stage given the lower burden and because the timing of a preliminary injunction may foreclose the possibility of developing 'a fully comprehensive presentation of [an accused infringer's] defenses'"); *Natera, Inc. v. NeoGenomics Lab'ys, Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024) ("a district court has no obligation to definitively construe claims at the preliminary injunction stage.").  Here, the naked eye is all that is needed to assess whether SharkNinja is likely to prevail on infringement.  Moreover, Defendants have not identified any prior art that is likely to overcome the strong presumption of validity; indeed, their principal prior art reference was already disclosed to and considered by the Patent Office before the patent issued.

Defendants' remaining arguments also fail.  Contrary to Defendants' arguments, there is no question of inventorship or ownership of the asserted patents.  The manufacturer of the SLUSHi, Weili, did all of its work under contract with SharkNinja, and that contract explicitly states that all intellectual property developed by Weili will be owned by SharkNinja.  Moreover, there is no question of personal jurisdiction that prevents an injunction here.  SharkNinja demonstrated that every Defendant has offered for sale the Accused Products in the State of Florida.  SharkNinja included screenshots showing those offers with its motion.  Moreover, SharkNinja has since actually ordered many of the accused machines to Florida, consummating the sale itself.  Both the

offers to sell and the sales themselves are acts of infringement in this State, conferring jurisdiction. As Defendants have not mustered any compelling argument to counter SharkNinja's strong evidence of likelihood of success and irreparable harm, the Court should issue an injunction.

## II.    <u>ARGUMENT</u>

The Court has already recognized the ongoing harm Defendants' continued infringement by granting SharkNinja's expedited motion for TRO.  Those same circumstances persist during the ongoing critical holiday season.  Lessing Decl. ¶ 25.  The entry of a preliminary injunction will stop Defendants from benefiting from their unlawful infringement of SharkNinja Patents and will preserve the status quo until the case is decided on the merits.  *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 445–46 (1974). Without the relief requested herein, Defendants' infringing activities will continue unabated, nullifying the protection afforded by the TRO and inflicting harm that cannot be compensated by monetary damage alone.

### A.  **The Four Factors That Warranted Entry of a TRO Continue to Favor Entry of a Preliminary Injunction**

To obtain a preliminary injunction, a party must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005); *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets).  Each of these factors strongly favor an injunction here.

### 1.    SharkNinja has Shown Likelihood of Success on the Merits

As demonstrated below in SharkNinja's opening brief and below, the Court should find—again—that SharkNinja is likely to prevail on the merits of its patent infringement claims.  The infringement case here is straightforward and is evident to the naked eye.  Nothing about these patents is rocket science.  Claim construction and expert testimony is not necessary to see how similar the Defendants' "smiley face" drip tray design is to the D236 patent or that the Defendants products have an asymmetric mixing vessel with a side baffle, as required by the '028 Patent.  Defendants complain that ***individual*** analysis with respect to each Accused Product is required.[3]  But it is facially evident that each Accused Product belongs to a handful of representative groups sharing an identical copycat industrial design template and specification, with only the branding letters differing.[4]  *See* Schedule A [ECF No. 21-1].  Representative infringement analysis proves that each of the represented Accused Products infringe when the patent owner establishes that substantially the same analysis applies to each of the represented accused product.  *TiVo, Inc. v. EchoStar Communications Corp.*, 516 F.3d 1290, 1308 (Fed. Cir. 2008) ("We therefore analyze all of the [accused products] together" where the patent owner provided evidence of similarity while "[the defendant] points to no distinction among the [accused products] that would require separate analysis.").  Other than the blanket assertion that individual analysis is required, no Defendant has pointed to any meaningful differences among the Accused Products that would require a separate infringement analysis for any individual Accused Product.  Nor have Defendants made any credible argument that their products are different than the two asserted patents.

---

[3] *See* [ECF No. 109 at 12-13] (Love Defendants), [ECF No. 73 at 10] (Liu Defendants),
[4] Indeed, as evidenced by Heim Defendants with their declarations [ECF Nos. 70, 70-1, and 70-2] and another subset of Defendants proceeding on a different schedule for the determination of Preliminary Injunction with their declaration [ECF Nos. 80 and 80-1], groups of Defendants share trade names in the U.S. market, source manufacturing of the Accused Products from the same OEM using exactly the same design and specification, and flood the market *en masse* with dozens of different, sometimes nonsensical, brand names.

As to validity, "each issued patent carries with it a presumption of validity under 35 U.S.C. § 282" sufficient to establish a likelihood of success on the validity issue. *Tinnus Enters., LLC v. Telebrands Corp.*, 846 F.3d 1190, 1205 (Fed. Cir. 2017); *Doubleday Acquisitions LLC v. Envirotainer AB*, No. 1:21-cv-03749, 2022 WL 2784800, at *3 (N.D. Ga. May 31, 2022). Against this strong presumption of validity, Defendants only come up with scattershot challenges based on references that are only semantically relevant but are miles away from the claimed inventions in the Asserted Patents. To credit a validity challenge at the preliminary injunction stage, the Court must conclude "it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009). While a few groups of Defendants have raised invalidity as an issue, none of them have shown a substantial question of validity that could suffice to support a judgment of invalidity at trial, and certainly have not demonstrated that it is "more likely than not" that they will prevail on invalidity.

Defendants' specific arguments on each of the two asserted patents are addressed below.

### a) SharkNinja is Likely to Prevail on the D236 Patent

**<u>Infringement</u>**. For design patent infringement, courts consider whether an "ordinary observer," familiar with the prior art, would view the overall appearance of the accused design as "substantially similar" to the patented design and that "the accused device contains substantially the same points of novelty that distinguished the patented design from the prior art." *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 668 (Fed. Cir. 2008) (internal citation omitted). Here, side-by-side comparisons in Exhibit 3 to the Lessing Declaration show that each Infringing Product identified on Schedule A include a tray, having front-face geometries and curved bottom portions that replicate the patented features and are, to an ordinary observer, substantially the same in

overall visual impression as the D236 Patent design.  *See* Compl. ¶¶ 3, 73–76 & figs.; Lessing

Decl. ¶¶ 18–19 & Ex. 3 thereto [ECF No. 22-4].  This is illustrated below:

| D236 Patent | Representative Accused Product |
|---|---|
|  | |

This satisfies the ordinary-observer test under *Egyptian Goddess*.  543 F.3d at 668.

Groups of Defendants have argued that they do not infringe the D236 Design Patent

because SharkNinja's contentions are not specific enough.  For clarity, SharkNinja supplements

with infringement evidence with respect to each and every of Defendant's Accused Products in the

format of a claim chart, attached as Ex. A herewith.  Nothing in that chart changes the clear

evidence of infringement demonstrated in Schedule A and in Plaintiff's Motion for PI.

Love Defendants specifically argue that their Accused Products do not infringe the D236 Design Patent because their user-facing surface of the collection tray is completely flat while the SharkNinja product has a slight curvature at each of the two lateral ends. [ECF No. 109, 18–21.] But the legal test for infringement is whether an "ordinary observer" would view the overall appearance of the accused design as "substantially similar" to the patented design; an infringing product need not be an exact copy of the patented design, and Defendants cannot escape infringement by introducing minor variations. *Egyptian Goddess*, 543 F.3d at 668–70. Defendants cannot show the lack of inward curvature gives substantial differences in the overall appearance to an ordinary observer. Similarly, Xu Defendants argue that their Accused Products do not infringe because they allegedly "create a different overall visual impression" citing minute differences such as the aforementioned lack of slight curvature at the ends, slight concavity, slight offset in concentricity, and mathematical "width-to-height ratio" of the Accused Products' collection trays. [ECF No. 146, 16–17.] These minor mathematical differences are insufficient to escape infringement. *Egyptian Goddess*, 543 F.3d at 668–70. The similarity speaks for itself:



| D236 Design Patent, Fig. 3 (showing the shape of the user-facing surface) | [ECF No, 146, 16] (picture of exemplary Accused Product) |
|---|---|

Relatedly, Xu Defendants argue that the D236 Design Patent is narrow in scope, without citing any legal support. [ECF No. 146, 14–17.] Xu Defendants cite to Chinese Utility Model CN219047235U and argue that the Chinese Patent discloses "a tray-like bottom housing" *Id.* Even more confusingly, Defendants points to an "air guide base shell 243" and rebrands it "tray-like bottom housing." *Id.* The cited Chinese Utility Model only discloses an ice cream machine "200"

that is internal to a refrigerated space not visible to anyone.  [ECF No. 146-7 at ¶[0096] and Fig. 2].  Specifically, the cited "air guide base shell 243" being part of the refrigeration unit is disclosed to be an "air guide" equipped with "multiple air outlets 24301."  [ECF No. 146-7, ¶[0069]].  This "air guide" has no design element similar to the claimed collection tray design and, being part of an internal refrigeration unit 200, has no exposed parts to a user in operation whatsoever.  In fact, the CN235U utility model has no disclosure about a visible collection tray or the shape thereof.  *See* [ECF No. 146-7].

Love Defendants further argue that their Accused Products do not infringe the D236 Design Patent because they practice Chinese Patent No. CN114017963B (the "CN963 Patent"), specifically a collection tray 5 disclosed therein.  [ECF No. 109, 19, 21–24].  To the contrary, they do not practice anything from the CN963 Patent, and the CN963 Patent is irrelevant.  To begin with, the CN963 Patent discloses an ***ice-making machine***, not a frozen drink maker.  [ECF No. 109-7 (English Translation of the CN963 Patent), 5].  Further, the collection tray 5 is disclosed to be ***hidden from user view*** by having a rear sliding entrance: "as shown in Figures 1, 2 and 4, a sliding entrance 41 for the water receiving box 5 to be inserted and slid into is correspondingly provided on the rear end wall of the ice receiving inner tank 4 […]"  *Id.* at 11; [ECF No. 109 at 19] (citing Fig. 2 of the CN963 Patent, showing the entrance 41 at the rear end of the ice making machine).  As such, the "arch-shaped" sidewall of the collection tray faces the side wall and is never exposed to an ordinary observer.  Moreover, the "arch-shaped" side wall is facially and vastly different from the claimed "smiley face" design as it has no straight edge designs anywhere, apparent from a simple visual comparison:



| [ECF 109-7, 14] (excerpted Figure 1 and highlighted to show the "arch-shape" collection tray) | D236 Design Patent, Fig. 3 (showing the shape of the user-facing surface) | [ECF 109, 20] (picture of exemplary Accused Product, annotated by Defendants allegedly showing the absence of inward curvature) |
|---|---|---|

If anything, the disclosure of the CN963 Patent only shows that many other designs of a condensed water collection tray exist without affecting the functionality, including using an "arch-shaped" tray, and/or sliding it in sideways, from the rear.

Love Defendants also present Fig. 1 of a Taiwan Patent No. 161842 as an "arch-shaped collection tray" but do not present any translations.  [ECF No. 109, 18–19]; [ECF No. 109-9]. Apparently this item is a ***grinder*** and is irrelevant to the frozen drink machine collection tray. [ECF No. 109-0].

**Validity**.  Two groups of Defendants allege that the D236 Design Patent is invalid because it is "functional."  [ECF No. 146, 10–14] (Xu Defendants); [ECF No. 109, 13–17] (Love Defendants).  For example, Love Defendants cite to U.S. Patent Application 18/415,817, to which the D236 Design Patent claims priority, without providing a copy of the published application, and allege that because the application discloses that the evaporator-facing surface 506 and top surface 520 of the collection tray may conform with the shape of the evaporator 202—which happens to

be cylindrical—the collection tray claimed in the D236 Design Patent must be functional.  ECF No. 109, 15-17. Xu Defendants echo the same arguments.  [ECF No. 146, 10–14].

Defendants' analysis is fundamentally flawed in that it conflates a design dictated by function with a design of an object that also has a function.  The D236 Patent claims a design of an object that ***also has a function***.  In the first instance, the cylindrical shape of the evaporator is itself a design choice of the Patent Applicant.  The bottom half of the evaporator being semi-cylindrical may be changed into other shapes such as triangular, oval, waveform, or zigzag while providing the dripping points for condensed vapor and without effecting the utility.  Nothing in the '886 Publication teaches any required the shape of the evaporator.

Further, the very sections of the '886 Publication Defendants cite to explicitly teaches that the shape of the collection tray disclosed is one design choice, and that other shapes can be contemplated without reference to utility.  For example, the '886 Publication teaches that the "evaporator-facing surface 506 ***may be*** semi-cylindrical" it also teaches immediately thereafter "[***h]owever, the disclosure contemplates other suitable shapes***, ***such as rectangular***, of the collection portion 502."  Ex. B, ¶[0052] (emphases added).  This shows that the particular shape disclosed here is only one possible design which can be changed without affecting the utility.

Moreover, Love Defendants cite to portions of Ms. Lessing's Declaration and mischaracterize it.  [ECF No. 109, 14–17].  Specifically, Defendants repeatedly cited to paragraph 10 of Ms. Lessing's Declaration and try to add their spin on it. *Id.*  (citing [ECF No. 22-1 at ¶10]).  The entirety of the paragraph is reproduced here:

> 10. Likewise, SharkNinja's team developed a removable tray that ***allows*** the user to easily dispose of excess slush ***while providing an overall clean look on the face*** of the machine. To make that possible, the tray's ample width and gentle curvature create the perfect clearance needed to sweep excess and sticky fluids away in a single horizontal motion, all ***while preserving the product's***

> ***lightweight, pill-shaped design***. Because the circular drum nests
> within the pill-shaped vessel, the tray echoes that geometry: The
> lower curve provides the necessary tray volume, with the space on
> the side corners efficiently packaging the electronics. This effort—
> ***refining every millimeter of the front face*** and placing hand
> touchpoints ergonomically—ensures the unit remains compact,
> countertop-worthy, and easy to clean and maintain.

[ECF No. 22-1, ¶10] (emphases added).

Ms. Lessing's Declaration explicitly refers to the challenge of making an impressive design ***while not negatively impacting utility***. This is different from a design being dictated by function.

In support of their mischaracterizations, Love Defendants compile a list of six factors to be considered while citing to *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1322 (Fed. Cir. 2016) and *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 930 F.3d 1314, 1319 (Fed. Cir. 2019). [ECF No. 109 at 14]. While none of these cases actually list the factors Defendants recite in their brief, the Federal Circuit did hold that among the list of factors in determining whether a patented design as a whole is dictated by functional considerations are whether "alternative designs" exist, "whether the protected design represents the best design; whether alternative designs would adversely affect the utility of the specified article; whether there are any concomitant utility patents; whether the advertising touts particular features of the design as having specific utility; and whether there are any elements in the design or an overall appearance clearly not dictated by function." *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1456 (Fed. Cir. 1997). These factors all support the conclusion that the design of the D236 patent is ***not*** functional.

Defendants cite to no legal authority suggesting that making a design *while maintaining* function is the same as being "dictated by function." [ECF No. 109, 14–17]; [ECF No. 146, 10–14]. Moreover, Defendants have not conducted any analysis with respect to any of the factors relevant to the determination of whether the patented design as a whole is dictated by functional considerations. *Id.*

12

To the contrary, many alternative designs may exist without affecting the functionality of the collection tray, including a "rectangular" shape as suggested by ¶[0052] of the '886 Publication.  For example, the side profile of the collection tray may be any of these to accommodate various shapes of the evaporator.



In contrast, the claimed "smiley face" shape of the D236 Design Patent cannot be "dictated" by functionality as so many alternatives exist.



FIG. 1

D236 Design Patent at Fig. 1 (annotated to highlight the unique design shape of the collection tray).

Love Defendants further claim that the D236 Design Patent is invalid because it is allegedly concealed during normal use, citing *Auto. Body Parts*, 930 F.3d at 1321 (citing *In re Webb*, 916

F.2d 1553, 1557–58 (Fed. Cir. 1990)) for legal support.  [ECF No. 109, 17–18].  *Auto. Body Parts* however, never holds anything about invalidity of a design patent.  At most, the holding can be read to mean that the parts not visible to an ordinary observer should not be considered in the infringement analysis of a design patent.  *Auto. Body Parts*, 930 F.3d at 1321 ("a design is generally not a 'matter of concern' […]if it may not be observed[…]").  Similarly, Xu Defendants argue that the collection tray "is typically not visible or emphasized."  [ECF No. 146, 17].  Xu Defendants cite to *Egyptian Goddess* for legal support, but the pin cite does not support Defendants' proposition.  *Egyptian Goddess* does not discuss relative "prominence" or "visibility" in the infringement analysis.  *Id.* at 543 F.3d at 670, 677–78.  Defendants admit that the ***user-facing surface*** (labeled as 510 in the '886 Publication) is visible during normal use.  [ECF No. 109, 17–18].  And that user-facing surface is exactly the important aspect of the design analyzed to establish infringement of the Accused Products.



Complaint [ECF No. 1 at 7] (annotated to show the user-facing surface of the collection tray).

As analyzed above, Defendants have not shown that it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that either the '028 Patent or the D236 Design Patent is invalid.

b)       **SharkNinja is Likely to Prevail on the '028 Patent**

<u>**Infringement**</u>.  For utility patent infringement, courts compare the construed patent claim to the accused product or method.  *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 80 F.4th 1363, 1376 n.7 (Fed. Cir. 2023), *cert. denied*, 144 S. Ct. 2563 (2024). Patent claims can be "literally" infringed, such that every claim element is present in the accused device, or infringed under the "doctrine of equivalents," where "the accused product is insubstantially different from the claimed element, that is, where it performs substantially the same function in substantially the same way to obtain substantially the same result."  *Bristol-Myers Squibb Co. v. Andrx Pharms., Inc.*, 343 F. Supp. 2d 1124, 1133–34 (S.D. Fla. 2004).

Seventy-one of the products that Defendants are making, using, offering for sale, selling, and/or importing also infringe at least Claim 1 of the '028 Patent, both literally and under the doctrine of equivalents.  These Infringing Products each include the claimed asymmetric wall portion and side baffle.  *See* Compl. ¶¶ 3, 69, 75, [ECF No. 21-1].  This is easily verified with the naked eye, for example in the two Accused Products below.



Liu Defendants argue that their Accused Products do not infringe because they use a central mixing blade.  [ECF No. 73, 4–7].  This is *non sequitur*.  Asserted Claim 1 is directed to the asymmetrical portion of the mixing vessel wall with a side baffle, not directed to the mixing blades in the center of the mixing vessel.  Moreover, Defendants' own confusion betrays their infringement—Defendants appeared to attempt to cite to SharkNinja's product while using a picture of the Accused Product instead.  [ECF No. 73, 6] (citing a picture of an Accused Product but labeling it as SharkNinja's product).

Groups of Defendants have argued that they do not infringe the '028 Patent because SharkNinja's contentions are not specific enough.  While SharkNinja demonstrated infringement in Schedule A and its PI Motion, SharkNinja supplements this Reply with infringement contentions with respect to each of Defendant's Accused Products in the format of a claim chart, attached as Ex. B herewith.  With the exception of the Liu Defendants addressed above, Defendants have raised no serious argument that their products do not infringe.  Indeed, the single expert the Farco Defendants offered does not even suggest non-infringement.

**Validity**.  Defendants raise scattershot prior art in an attempt to overcome the strong presumption of validity.  None of these prior art references come close to doing so.  Xu Defendants allege that European Patent EP3305090B1 (the EP090 Patent) renders claim 1 of the '028 Patent obvious.  [ECF No. 146, 4–9].  Specifically, the Defendants point to a "radially protruding longitudinal portion (2A)" of the mixing chamber and claim that it is asymmetric and corresponds to the "side baffle" element of claim 1 of the '028 Patent.  *Id.*  But item 2A in the EP090 patent does not disclose or render obvious claim 1 of the '028 Patent.

Claim 1 of the '028 Patent recites that the asymmetrical wall "comprises a side baffle."  In other words, the baffle has to be part of the wall.  This is shown for example in Fig. 5B:



*Id.* at Fig. 5B (annotated to highlight the exemplary "side baffle").  Thus, the claimed "side baffle" is a structure that is part of the wall extending into the inner space of the mixing vessel.  On the other hand, the cited EP090 Patent teaches a "radially protruding longitudinal portion" (2A) that is a protruding extension of the inner space of the container vessel ***into the wall***.  Figure 8 of EP090 clearly shows this portion:



*Id.* at Fig. 2B (annotated to highlight the "radially protruding longitudinal portion" (2A)).

As shown above, the "radially protruding longitudinal portion" (2A) is not a baffle that is part of the wall intruding into the vessel space but rather an extension of the container space. The baffle design claimed in the '028 Patent allows for a shorter mixing vessel through the use the baffles that extend into the vessel space. The patent explicitly describes this benefit:

> The application, in various implementations, addresses deficiencies of existing frozen drink makers associated with controlling slush flow. Unfortunately, ***existing frozen drink makers must be very tall to provide sufficient headspace above the slush, so the slush does not contact the upper sidewalls of the vessel and the top of the chamber***.
>
> Accordingly, there is a need for features within the mixing chamber to effectively control the slush and ***keep it from migrating up the sidewalls and sticking to the top of the chamber***. The need for controlling slush is especially important for household frozen drink makers (as compared to commercial models) because ***household frozen drink makers cannot rely on a tall chamber height to control slush flow***.

'028 Patent at 4:51–63 (emphasis added). The inventors of the '028 patent solved the problem by using internal baffles such as the side baffle on the asymmetric wall, in order to direct the slush flow to the center rather than toward the top. The EP090 reference takes the opposite approach and ***extends the height of the chamber***, which is the opposite of SharkNinja's approach.

Likewise, nothing in the EP090's disclosure teaches or even suggests that this "radially protruding longitudinal portion" (2A) is asymmetrical or is configured to "promote slush flow away from the left side or the right side of the vessel chamber and back toward a center of the vessel chamber" as the claim language requires. Indeed, the Defendants cannot point to any disclosure for this claim element, and do not attempt to show it is obvious. [ECF No. 146, 8–9].

Liu Defendants allege that Chinese Patent CN109497252 (the "CN252 Patent") in view of US Patent No. 9,302,233 B1 (the "US233 Patent") renders Claim 1 of the '028 Patent obvious. [ECF No. 73, 7–10]. In a puzzling attempt to articulate the rationale of the alleged obviousness

combination, Defendants conclusorily argue that a skilled artisan would "combine the baffle and cylinder in CN252 Patent" to arrive at Claim 1 of the '028 Patent. *Id.*, at 9. However, Defendants cite to no portions of either the CN252 Patent or the US233 Patent in support of this position. Indeed, Defendants fail to even explain how any portion of the CN252 Patent, submitted in Chinese without translations, is relevant to any element of claim 1 of the '028 Patent. *See* [ECF No. 73-1]. Defendants cite to Figure 5 of US233, purportedly showing "removable asymmetric baffles" but reproduces Figure 8 of US233 in the Opposition. [ECF No. 73, 7–8].



US233 Patent at Fig. 8.

Again, Defendants seem to rely solely on the fact that the inventors of the US233 Patent chose to call this device "baffles" without paying any attention to all the claim elements of claim 1 of the '028 Patent. Defendants cite nothing to show that the "baffles" are part of an asymmetrical portion of the wall. [ECF No. 73, 7–10]. Indeed, to the extent that elements labeled 30 are baffles, they are arranged in symmetric circle. Other than relying only on the semantic similarity, Defendants cite nothing to show that the "baffles" are configured to extend laterally along the left side or the right side of the vessel chamber, whereas the cited "baffles" are removable and insertable bottom of mixing vessels and are apparently mirror-symmetrical and radial-symmetrical. *Id.*; *see also* [ECF No. 73-2] (US233 Patent) at Abstract and Fig. 8. Defendants cite

nothing to show that the "baffles" are configured to promote slush flow away from the left side or the right side of the vessel chamber and back toward a center of the vessel chamber. [ECF No. 73, 7–10]. Very confusingly, Defendants cite to an image of ***an Infringing Product*** reproduced in the Complaint but ***purporting it to be SharkNinja's product***, in support of the barebones allegation that a skilled artisan would "likely [] accommodate the baffle" exactly as claimed. *Id.*, at 9–10. The Defendants themselves cannot distinguish their products from SharkNinja's.

Finally, Farco Defendants argue that Italian Patent No. BO20100713A1 ("IT713 Patent") anticipates claim 1 of the '028 Patent. [ECF No. 150, 12–17]. Specifically, they point to a "Protrusion 27" as alleged disclosure of the "side baffle." *Id*.

As an initial matter, as Defendants admit, [ECF No. 150, 16], this IT713 Patent was ***disclosed by the Applicant, considered by the Examiner, and cited on the face of the Patent***. '028 Patent at page 6, item (56). In other words, the Patent Office has already considered and rejected the arguments advanced by Farco Defendants. Defendants, without any legal or factual support, argue that the presumption of validity should be thrown out and the Examiner's work negated simply based on their conclusory allegations of anticipation.

Defendants identify no portion of the IT713 Patent as conceivably disclosing the limitation "the side baffle further configured to promote slush flow away from the left side or the right side of the vessel chamber and back toward a center of the vessel chamber." In fact, redirection of slush flow toward the center is not a concern to the IT713 Patent. The IT713 Patent teaches that the "function of the protrusion 27 is to interrupt the flow of the product along the inner surface of the wall 9 immediately before the flow reaches the opening 22, so as to induce turbulence in the product being processed and thereby further improve mixing of the product itself." This teaching indicates that the protrusion 27 is configured to introduce turbulence (redirection at random

directions) in order to "improve mixing" instead of "to promote slush flow away from the left side or the right side of the vessel chamber and back toward a center" as required. As shown by Defendants, the IT713 Patent discloses a prior art commercial-grade machine with a very tall mixing vessel, where redirection of slush to limit sticking to a top of the mixing vessel is not a technical problem to be solved. Nothing is disclosed here to "promote slush flow away from the left side or the right side of the vessel chamber and back toward a center." Moreover, the alleged "side baffle" is ***not*** contained within the alleged "asymmetrical portion of the wall" as required by the claims. The "asymmetry" of the Italian patent is the different heights of the walls 25 and 26 as shown in Fig. 4. [ECF No. 150-1], p. 9. The alleged "side baffle," on the other hand, is not part of that portion of the wall, as claim 1 of the '028 Patent requires.

SharkNinja objects to the declaration of Jerry Hancock [ECF No. 150-2] as hearsay and unqualified "expert" testimony. Even if it is considered, it does not cure the fundamental lack of disclosure on redirection of slushes element. Other than conclusory parroting of the Defendants' brief, the declaration fails to explain how a skilled artisan would see the disclosure of "protrusion 27" as "configured to promote slush flow away from the left side or the right side of the vessel chamber and back toward a center" as claimed.

Since none of the Defendants have identified any prior art that comes close to claim 1 of the '028 patent, they cannot overcome the strong presumption of validity and establish that it is "more likely than not" that the patent is invalid.

**Inventorship**. Heim Defendants also allege that the '028 Patent has incorrect inventorship, because employees of Weili made contributions to the conception. [ECF No. 70, 9–10]; [ECF No. 151, 7–15]. Relatedly, the Defendants allege that Weili "potentially" had prior sale of the products and go as far as alleging fraud on the Patent Office. [ECF No. 151, 8–15]. These allegations are

on their face meritless.  As Defendants admit, Weili is a contract manufacturer.  [ECF No. 70, 3–4].  *See* Ex. PX-42 (Ex. C).  All technical designs including the one "fs300_p1.asm" CAD file referred to by Defendants are conceived and specified by SharkNinja and only provided to Weili for the purposes of manufacturing products for SharkNinja.  Weili, as a manufacturing contractor, had no inventive contributions to the claims of the '028 Patent.  Even to the extent there was any contribution, Weili was under contractual obligation to assign such intellectual property rights to SharkNinja, and the contract between the companies clearly states that all Intellectual Property, whether invented by SharkNinja or Weili, is the property of SharkNinja.  PX-42 (Ex. C), § 13.1(d) and (e).  Defendants point to no evidence of any invalidating prior sale by Weili, instead relying on its "potential" existence.  These arguments related to the contractor Weili fall far short of the required showing of "more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid."

## 2. SharkNinja Will Suffer Irreparable Harm in the Absence of Preliminary Injunction

The Court has already found—and should find again—that "SharkNinja is likely to suffer from immediate and irreparable and irreparable injury if" injunctive relief is not issued.  The Court based that initial conclusion on a list of "specific facts" established by SharkNinja, including that it has "good cause to believe that more products that infringe one or more of the SharkNinja Patents will continue to appear in the marketplace, further diluting the market share created by SharkNinja's innovative products."  [ECF No. 26 at 4].

SharkNinja is still suffering and will continue to suffer, until Preliminary Injunction is granted, from the same irreparable harm caused by the Defendants' infringement.

### a) SharkNinja Suffers From Irreparable Harm to Its Business And Brand

SharkNinja is suffering actual market dilution, price erosion, loss of virality and brand loyalty, and forced competition with its own inventions to which it has exclusive rights, because of the copycats as evidenced by comparing SLUSHi to past category-defining products like CREAMi.  Lessing Decl. [ECF No. 15-1] at ¶ 27.  This actual harm is not merely speculation.  As Ms. Lessing explains, SharkNinja's launches rely on short, non-repeatable viral windows when consumer attention, brand equity, and first-mover recognition peak.  *Id.*  Allowing Defendants' infringement to continue through this period would siphon network effects, erode price integrity, and permanently dilute the goodwill and market position SharkNinja has built.  *Id.*

Ms. Lessing's Declaration illustrates the gravity of the harm suffered by SharkNinja that is being caused by knock-offs.  On July 11, 2024, the Ninja SLUSHi product was launched, and there were no known competitors of this new category-defining product at launch.  Only three months later, at the Canton Fair in Guangzhou, China, Shark saw a handful of knockoff prototypes on display.  From December 2024 to February 2025: Shark began seeing more knockoff brands on the market, some which they had seen displayed at the October 2024 Canton Fair.  Most of the knockoff units at this time were manufactured by "Weili", with whom SharkNinja originally had contracted to conduct manufacturing of certain products.  Throughout 2025, SharkNinja observed that additional manufacturers started selling knockoff slushie machines. And in September 2025, the "floodgates" truly opened in terms of the number of manufacturers and Shark started seeing myriad different brands selling the same style units.  *Id.*

Defendants' ongoing sale of Infringing Products is causing SharkNinja brand equity depletion, loss of market share, and loss of exclusivity in the very market it created.  Compl. [ECF No. 1] ¶¶ 3, 45–46, 60–61, 63–65; Lessing Decl. [ECF No. 15-1] ¶¶ 24–30.  A patent confers "the right to exclude others from using his property."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 392 (2006) (citing *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932)) (internal citation omitted). Violation of a patent owner's "right to exclude" renders monetary remedies inadequate in circumstances where exclusivity, market position, and brand equity are actively depleted. *Id.*; Compl. [ECF No. 1] ¶¶ 63–65; Lessing Decl. [ECF No. 15-1] ¶¶ 24–30. Indeed, courts have held that a "loss in market share" constitutes irreparable harm. *Robert Bosch LLC v. Pylon Mfg. Co.*, 659 F.3d 1142, 1149–51 (Fed. Cir. 2011) (holding that it is a "clear error of judgment" to deny irreparable harm when the accused product causes a direct competitor patentee to lose market share and access to prospective customers). The harm Defendants' activity is causing SharkNinja is therefore irreparable and warrants relief.

The irreparable harm is not mere speculation, but actual losses reflected in market data. Since the Defendants have begun selling their infringing products this year, SharkNinja has suffered from decreased consumer confidence, brand equity depletion, and market status dilution—ongoing harm that cannot be adequately remedied by money damages. *Id.* ¶¶ 63–65. Defendants' infringement erodes SharkNinja's brand equity, undermining consumer confidence and diminishing the premium associated with SharkNinja's innovation. Lessing Decl. [ECF No. 15-1] ¶ 23. Defendants are free-riding on SharkNinja's time- and capital-intensive inventions, capturing sales that would otherwise accrue to SharkNinja, diluting market share, eroding price premium, and increasing the risk of poor product quality. *Id.*; *Robert Bosch*, 659 F.3d at 1151. SharkNinja, through its SLUSHi, has become synonymous with being the innovator in the counter-top, at-home slush machine market, and the proliferation of infringers leveraging SharkNinja's patented features without its quality controls further injures SharkNinja's reputation and consumer trust in the brand, particularly given SharkNinja's social media-driven emphasis on groundbreaking design, ease of use, and cleaning. Lessing Decl. [ECF No. 15-1] ¶¶ 26–27.

Indeed, early indicators for 2025 sales show the SLUSHi is at risk of underperforming relative to prior category-defining launches of SharkNinja products. *Id.* ¶ 27. This market data suggests ongoing diversion and brand dilution. *Id.* ¶ 28.

> **b)** **Harm Is Irreparable Because Monetary Judgment Will Be Uncollectible**

Irreparable harm warranting issuance of Preliminary Injunction is also appropriate where "Defendants' business operations are geographically 'far-flung,' making the enforcement of a money judgment 'exceedingly difficult.'" *Canon, Inc. v. GCC Int'l Ltd.*, 263 F. App'x 57, 62 (Fed. Cir. 2008) (affirming grant of preliminary injunction against a foreign company). As discussed, Defendants do not have real business addresses in the U.S. and have no or few assets associated with their e-commerce storefronts.

The shifty nature of Defendants' business model prevents any meaningful collection of any monetary judgement award against them. This fact alone makes the harm caused by Defendants irreparable. The fact that a defendant is a foreign entity "alone is sufficient to show that [the plaintiff] will likely be irreparably harmed." *Aevoe Corp. v. Shenzhen Membrane Precise Electron Ltd.*, 2012 WL 1532308, at *5 (D. Nev. May 1, 2012). Courts have indeed consistently found insufficiency of monetary damages where Defendants in a patent infringement case are foreign entities with no U.S. assets. *See Bushnell, Inc. v. Brunton Co.*, 673 F. Supp. 2d 1241, 1263 (D. Kan. 2009) (finding that "the prospect of collecting money damages from a foreign defendant with few to no assets in the United States tips in favor of a finding of irreparable harm."); *Shu v. Di*, 2025 WL 1483497, at *4 (W.D. Pa. Apr. 11, 2025) (granting Preliminary Injunction against foreign infringers, noting that "Defendants are foreign corporations that allegedly continuously hide or change their identities, providing little assurance that Plaintiff could collect monetary damages.").

Here, in view of the fact that dozens of Chinese companies with no U.S. presence or assets, are infringing, any judgment at the conclusion of a trial on the merits will be virtually meaningless to SharkNinja. The damage will have been done, and SharkNinja will have no recourse to compensate for that damage.

> **c)**     **The Irreparable Harm Is Being Caused By Defendants' Infringing Acts**

The irreparable harm being suffered by SharkNinja is directly caused by Defendants' infringement. "[A]lthough the irreparable harm and the causal nexus inquiries may be separated for the ease of analysis, they are inextricably related concepts." *Id.* at 1374. Strong evidence of copying establishes a further link between the infringers' subjective beliefs and the consumers' perceptions and "strengthening a causal nexus and irreparable harm to [the patentee]." *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 643 (Fed. Cir. 2015). The more stringent holding in *Apple v. Samsung* is also contributed in part by the complexity of a smartphone which does not extend to all consumer products. "Unlike a smartphone, which contains a myriad of features," the design of the mixing vessel and mixing tray of the SLUSHi "embody a substantial part of the patented feature and not much else," and that "Plaintiffs have become the market leader suggests that they possess a superior technology, the technology of the [] patent." *LifeScan, Inc. v. Shasta Techs., LLC*, 933 F. Supp. 2d 1243, 1262 (N.D. Cal.) (refusing to extend *Apple v. Samsung* causal nexus analysis to a blood glucose testing strip product), rev'd and remanded sub nom. *LifeScan Scotland, Ltd. v. Shasta Techs., LLC*, 734 F.3d 1361 (Fed. Cir. 2013) on other grounds.

By developing the features covered by the SharkNinja Patents, SharkNinja introduced a category-defining compact device suitable for under-cabinet placement on the countertop and that the Defendants fielded knockoffs to flood the market. [ECF No. 37 at 4-6]; Lessing Declaration

[ECF No. 22-1] at ¶¶ 11-19; and Exhibit 3 to Lessing Declaration [ECF No. 22-4]. As such, SharkNinja has not only proven that SharkNinja created a new market segment of under-cabinet and countertop home-use slush machine and became the pioneer and market leader, but also that the Defendants copied two of the most important features enabling a slush machine to be under-cabinet and countertop covered by the SharkNinja Patents. Thus, the causal nexus between the irreparable harm and Defendant's infringement is strongly supported.

Injunctive relief is essential to prevent further loss of market share and brand equity during a critical commercial period. Continued infringement will irreversibly erode network effects and first-mover recognition that cannot be restored after trial. Lessing Decl. [ECF No. 22-1] ¶¶ 24–30.

### 3.    The Balance of Hardship Tips Sharply in SharkNinja's Favor

The balance of equities strongly favors immediate injunctive relief because the concrete, ongoing harm to SharkNinja from direct copying and loss of control over its patented product and brand vastly outweighs any claimed burden on Defendants, who have no lawful entitlement to profits from their continued infringement. *Schiavo*, 403 F.3d at 1225–26 (11th Cir. 2005).

SharkNinja's social media strategy depends on consumer trust in authentic products, their ease of use and cleaning, and clear source identification. Defendants' infringing conduct has already undermined and continues to undermine consumer confidence in SharkNinja's brand by wresting control from SharkNinja over the quality of products embodying its patented design and technology. *See Daka Rsch., Inc. v. Individuals*, No. 22-cv-60246, 2023 WL 5310240, at *4 (S.D. Fla. July 14, 2023), aff'd and adopted, 2023 WL 5289258, at *1 (S.D. Fla. Aug. 17, 2023). On the other hand, any harm Defendants claim is self-inflicted because they chose to build and sell products infringing the SharkNinja Patents. *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F.

Supp. 2d 1078, 1083 (S.D. Fla. 2007) ("[A] company cannot build a business on infringements and then argue that enforcing the law will cripple that business.").

Defendants characterize their harms as loss of holiday sales, diminished rankings, and operational cash-flow constraints—monetary injuries that can be compensated if Defendants ultimately prevail, and that weigh far less than the continued erosion of a patentee's market position absent relief [ECF No. 92, 6–7; ECF No. 94, 11].  Defendants themselves attribute the most acute hardships to an account-wide freeze that "shuttered" storefronts during peak season and to a bond they view as too small relative to the breadth of that freeze [ECF No. 92, 6–7; ECF No. 94, 11–12]. These hardships have already been addressed:  Not only has SharkNinja narrowed the asset freeze to only those funds derived from the sale of the Accused Products, it has also offered to increase the bond twenty-fold.  Furthermore, Defendants' peak-season timing objection cannot convert continued infringement into an equitable shield.  Defendants chose to enter the market with the accused products during the holiday period; courts assess relative harms from granting or denying appropriate conduct restraints, not the retail calendar.  SharkNinja asks only for a tailored injunction focused on the identified accused listings.  Nothing is stopping Defendants from continuing sales of non-accused products [ECF No. 92, 6–7; ECF No. 94, 11–12].

### 4.      Issuance of the Injunction is in the Public Interest

As Defendants admit, "the public has an interest in the enforcement of legitimate patent rights, [ECF No. 70, page 12].  *Apple*, 809 F.3d at 647 ("[T]he public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his invention.").

Defendants' complaints about overbreadth and the injunction sweeping up non-parties have already been adequately addressed by SharkNinja's narrow, tailored request for an injunction as to specific defendants and specific accused listings as supported by the record [ECF No. 92, 6–7].

Additionally, Defendants' broad attacks on "Schedule A" joinder and judiciary resource allocation are not public-interest bases to deny relief, particularly where a tailored injunction is justified as to the named defendants.

Defendants attempt to invoke unadjudicated validity and inequitable-conduct allegations to tilt the public-interest factor against interim enforcement [ECF No. 70, 12–13].  But disputed, merits-heavy defenses are neither a component of nor a substitute for the four-factor test at the PI stage.  Allowing Defendants to continue profiting from infringement serves only to undermine the public's interest in consumer protection and innovation.

### B.  The Equitable Relief Sought is Appropriate

The Patent Act authorizes courts to issue injunctive relief "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  Furthermore, Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may issue a preliminary injunction upon notice.  The facts in this case warrant such relief.

### 1.    The Preliminary Injunction Should Continue to Enjoin Defendants' Unauthorized and Unlawful Infringement of the SharkNinja Patents

Plaintiffs request that the Court to issue preliminary injunction that requires Defendants to cease manufacturing, importing, advertising, promoting, offering to sell, selling, distributing, or transferring any products infringing the SharkNinja Patents, including the products identified on Schedule A.  SharkNinja is experiencing ongoing irreparable harm—including reduced consumer trust, brand equity depletion, and market status dilution—because of Defendants' ongoing infringement.  This relief is essential to continue to prevent erosion of market share and brand equity, and to stop Defendants from continuing to benefit from their unlawful infringement of the SharkNinja Patents while this case is pending for final adjudication.  Many courts, including this

Court, have authorized injunctive relief in similar cases involving the unauthorized and unlawful infringement of patents.  *See, e.g.*, *SHEFIT Operating Co., LLC v. Individuals*, No. 0:24-CV-61310, 2024 WL 4880617, at *3 (S.D. Fla. Nov. 22, 2024).

### C. The Posted Bond is Sufficient to Secure the Injunction

The posting of security upon issuance of a preliminary injunction is vested in the Court's sound discretion.  Fed. R. Civ. P. 65(c).  Because of the strong and unequivocal nature of SharkNinja's counterfeiting evidence against each of the Defendants at issue, SharkNinja respectfully consents to the Court's increase of its previously posted bond in the amount of five thousand dollars ($5,000.00) [ECF No. 26] up to a total of one hundred thousand dollars ($100,000.00) at the Court's discretion should an application be made in the interest of justice.

### D. Alternate Service is Appropriate

Defendants argue that Alternate Service was inappropriate.[5]  Defendants' attacks on service are, at best, a distraction.  The Court has already entered a TRO and authorized alternative service and notice.  *See* [ECF Nos. 26, 31].  Defendants received actual notice via email, marketplace messaging platforms, and/or the dedicated service website, and many have indeed appeared and litigated the merits.  In light of the Court's order granting SharkNinja's TRO and the undisputed effect of actual notice, these service arguments are moot.  SharkNinja has satisfied its notice and service obligations, and procedural skirmishing—now moot—should not derail the ongoing preliminary-injunction proceedings.

SharkNinja submitted sworn, certified statements detailing its investigation into whether physical addresses obtained from the marketplace platforms were actually associated with specific defendants.  *See* [ECF Nos. 30-1, 30-4].  Those submissions showed that the vast majority of

---

[5] ECF No. 60, 5–9;

physical addresses were inaccurate or unverifiable.  *See* [ECF No. 30 at 5]; [ECF No. 30-1 ¶¶ 14–15]; [ECF Nos. 30-2, 30-3, 30-4].  Plaintiffs followed the Court's directive and provided point-by-point certifications demonstrating why those addresses were unreliable for service purposes.  *See, e.g.*, [ECF Nos. 30-1, 30-4].  SharkNinja also explained—via attorney declaration—that, given the unreliability of physical addresses, it had not yet provided notice through those channels and therefore sought to use electronic means, including email (where available), marketplace messaging platforms, and a dedicated website for notice and case materials.  *See* [ECF No. 30-1 ¶¶ 3–4, 15].  In its TRO motion, SharkNinja further explained why *ex parte* relief was necessary to preserve the status quo and prevent irreparable harm, particularly where Defendants' scheme is electronic and susceptible to rapid, untraceable destruction by Defendants.  [ECF No. 22 at 8] (citing *Dell Inc. v. BelgiumDomains, LLC*, No. 07-cv-22674, 2007 WL 6862341, at *2 (S.D. Fla. Nov. 21, 2007)).

Defendants' reliance on the Hague Convention is also misplaced.  As the Court recognized in its Order Authorizing Alternate Service, "especially in a circumstance where service upon a foreign corporation under Rule 4(f)(1) or 4(f)(2) has been cumbersome, district courts have broad discretion under Rule 4(f)(3) to authorize other methods of service that are consistent with due process and are not prohibited by international agreements."  [ECF No. 31 at 2] (citing *Brookshire Brothers, Ltd. v. Chiquita Brands Int'l, Inc.*, No. 05-21962, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007) (citing *Prewitt Enters., Inc. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 921, 927 (11th Cir. 2003))).  The Court further held that "the Hague Convention does not specifically preclude service via e-mail and website posting."  ECF No. 31 at 2.  At a minimum, service via website posting is permitted here.  In any event, the Court has already found that the electronic notice authorized in this case is "reasonably calculated, under all circumstances, to

apprise [Defendants] of the pendency of the action and afford them an opportunity to present their objections." [ECF No. 31 at 2–3] (citing *Brookshire Brothers, Ltd*., 2007 WL 1577771, at *1).

### E.   This Court Has Personal Jurisdiction Over Each Defendant

Defendants' oppositions take an improperly narrow view of specific personal jurisdiction that is inconsistent with both Federal Circuit law in patent cases and Florida's long-arm statute. At the preliminary-injunction stage, plaintiffs need only make a *prima facie* showing that the Court may exercise specific jurisdiction over each moving defendant, and SharkNinja has done so by (1) proffering defendant-specific evidence that each moving defendant used interactive marketplace storefronts to offer for sale and sell the accused products into Florida, and (2) showing that its claims arise directly from those forum-directed offers and sales.

First, Defendants err in suggesting that the Court must find "actual, completed Florida sales" and that any showing short of that is categorically insufficient. Defendants rely on *NexLearn* to argue that "screenshots" of hypothetical availability cannot establish jurisdiction [ECF No. 78, 6–8 (citing *NexLearn, LLC v. Allen Interactions, Inc.*, 859 F.3d 1371 (Fed. Cir. 2017)]. But *NexLearn* stands for the unremarkable proposition that the mere existence of a passive or non-targeted website is not, by itself, purposeful availment. It does not insulate sellers who operate interactive storefronts and affirmatively ***target, accept, and fulfill*** orders into the forum. Federal Circuit precedent recognizes specific jurisdiction where a defendant purposefully directs infringing sales into the forum through a distribution channel or interactive platform and the claims arise from those sales. Defendants' own brief acknowledges that the due-process inquiry looks to whether the defendant "purposefully directed its activities at residents of the forum state," whether the claims "arise out of or relate to" those activities, and whether jurisdiction is fair and reasonable [ECF No. 78, 5–6]. That standard is satisfied when accused products are offered for sale or sold

to Florida consumers through interactive marketplace listings tied to the moving defendants. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1354 (11th Cir. 2013). SharkNinja has provided, for each Defendant, evidence of specific offers for sale of the accused products into this District and, on information and belief, alleges that each Defendant has completed *actual sales* of the accused products into the District. SharkNinja has therefore made its prima facie showing that this Court may exercise specific jurisdiction over Defendants.

Second, Defendants' attempt to sidestep Florida's long-arm statute fails. Defendants contend that SharkNinja did not "prove actual Florida sales" and therefore cannot satisfy Fla. Stat. § 48.193(1)(a)(2) [ECF No. 78, 8–10, 12–13]. But the statute reaches tortious acts "committed in Florida," which includes specific ***offers for sale*** of accused products into Florida that give rise to the asserted patent claims. 35 U.S.C. § 271(a). Defendants' domicile-based argument similarly fails. They suggest that because SharkNinja is incorporated in Delaware and its principal place of business is in Massachusetts, its "absence from Florida prevents it from establishing jurisdiction under Florida's long-arm statute. [ECF No. 78, 9–10, 12–13]. Defendants identify no authority holding that a non-Florida patentee cannot sue in Florida for an injury sustained in Florida. Specific jurisdiction turns on Defendants' Florida-directed conduct giving rise to the claims, not SharkNinja's state of incorporation or principal place of business.

Finally, to the extent a particular defendant disputes Plaintiffs' prima facie showing, targeted, expedited jurisdictional discovery is the appropriate and logical next step—not wholesale denial of preliminary relief as to defendants for whom the record already establishes Florida-directed conduct. Defendants themselves argue that the Court should resolve disputed, fact-intensive issues on a developed record [ECF No. 58, 4–7]; jurisdictional discovery serves that end

for any outlier defendant while the Court proceeds against those for whom Plaintiffs' prima facie showing is unrebutted.

Whatever the merits of Defendants' personal jurisdiction arguments, they are also now moot.   Plaintiffs have receipts and shipment confirmations evidencing that at least eleven Defendants have made ***actual sales*** of the accused products into this District, which independently satisfies due process and Florida's long-arm statute as to those Defendants.  Ex. D (Declaration of D. Brzozowski).  Exhibits 1–5 to Ex. D show that at least Auriswell, Bluebow, Dutepa, Eastplus, FOHERE, Inoviva, PAMBEE, Tefoqu, VEVOR, WIE, and Wongic have sold and shipped the accused products to an address in Miami.  These Defendants did not merely maintain a passive online presence that was merely accessible to Floridians; instead, they have purposefully directed their infringing activities to this District by affirmatively accepting orders to be delivered to a Miami address, preparing shipping labels designating a destination in Miami, and causing physical delivery into this District.

Florida's long-arm statute is likewise independently satisfied.   Section 48.193(1)(a)(2) reaches a "tortious act within this state," which is met where a defendant commits in-state infringing offers for sale and sales that give rise to the patent claims.  Under 35 U.S.C. § 271(a), patent infringement includes making an "offer to sell" and a "sale" of a patented invention; when a seller targets and completes a transaction for delivery into Florida, the tort is committed in Florida.  A single, deliberate shipment and sale into Florida is sufficient under the statute; here, SharkNinja's evidence shows at least *eleven* Defendants engaged in such conduct.

The Court should therefore reject Defendants' personal-jurisdiction challenge, find that Plaintiffs have made a prima facie showing of specific jurisdiction over the moving defendants, and, where necessary, order targeted jurisdictional discovery as to any defendant for whom the

Court desires further defendant-specific proof-without withholding relief as to those defendants whose Florida-directed offers and sales are established on this record [ECF No. 78, 5–10; ECF No. 58, 4–7].

## III.   <u>CONCLUSION</u>

In view of the foregoing, SharkNinja respectfully requests that this Court issue a Preliminary Injunction preventing the ongoing infringement of the asserted patents pending a trial on the merits in this case.[6]

Dated:  December 18, 2025.

Respectfully submitted,

**Kevin C. Kaplan, Esq.**
Florida Bar No. 933848
kkaplan@coffeyburlington.com
lperez@coffeyburlington.com
**Christopher E. Cheek, Esq.**
Florida Bar No. 91363
ccheek@coffeyburlington.com
lmaltz@coffeyburlington.com
service@coffeyburlington.com
**COFFEY BURLINGTON, P.L.**
2601 South Bayshore Drive, PH-1
Miami, Florida 33133
Tel:  (305) 858-2900

OF COUNSEL:

**Brian Rosenthal** *(admitted pro hac vice)*
brosenthal@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York NY 10166-0193
Tel:  (212) 351-4000

---

[6] Defendants Aobosi, Bizaura, Casidea, CyberChill, Fesoiu, Greenever, Hooure, Only, Rapsuar, Relexnow, Vibofrost, XianFeng have neither appeared nor opposed SharkNinja's Motion for PI and therefore have defaulted. Thus, this motion should be granted against each of these Defendants.

**Brian Buroker** *(admitted pro hac vice)*
bburoker@gibsondunn.com
**Shuo Josh Zhang** *(admitted pro hac vice)*
szhang@gibsondunn.com
**David Brzozowski** *(pro hac vice refiled)*
dbrzozowski@gibsondunn.com
**Yun Lin** *(admitted pro hac vice)*
rlin@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, D.C. 20036-4504
Tel:  (202) 955-8500

**David Glandorf** *(admitted pro hac vice)*
dglandorf@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1900 Lawrence Street
Suite 3000
Denver, CO 80202-2211
Tel:  (303) 298-5700

*Counsel for Plaintiffs SharkNinja Operating LLC and SharkNinja Sales Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 18, 2025, a true and correct copy of the foregoing was filed with the Court using the CM/ECF system, which will provide notice by email to all counsel of record on the Service List below. I further certify that a true and correct copy of the foregoing will be posted to a designated website (https://s20251114sdfla.info/) where copies of the relevant available documents filed in this action may be found.

/s/ Kevin C. Kaplan
Kevin C. Kaplan

| SERVICE LIST | |
| SharkNinja Operating LLC, et al. v. The Individuals, Corporations, etc. | |
| Case No. 25-CV-25323-RAR | |
|---|---|
| **Ziqi Yu, Esq.**<br>procollider@pm.me<br>chiyu@114514.esq<br>5794 Bird Road, Unit 554<br>Miami, Florida 33155<br>Telephone: (415) 519-5274<br><br>*Counsel for Defendants,*<br>*IceSwirls, Tefoqu, Wongic, Dutepa, Auriswell*<br>*(on Amazon), Auriswell (on Walmart),*<br>*Kelteroom*<br>*-and-*<br>*Third Party Respondents,*<br>*Grano Chef, oplace, POFABIK, BLIZZEE,*<br>*NLNYA, Nyzgax, DIGINAVI E-LINK (HONG*<br>*KONG) LIMITED ("Haysky" in Schedule A)*<br><br>*OF COUNSEL:*<br><br>**Weilian Song, Esq.** (admitted *pro hac vice*)<br>will@xyziplaw.com<br>XYZ LAW FIRM, LLP<br>2131 9th Street NW, Unit 1-565<br>Washington, D.C. 20001<br>Telephone: (857) 869-1626 | **Jianyin Liu, Esq.**<br>jamesliulaw@gmail.com<br>jianyin.cdc.@gmail.com<br>THE LAW OFFICES OF JAMES LIU PLLC<br>15750 SW 92nd Avenue, Unit 20C<br>Palmetto Bay, Florida 33157<br>Telephone: (305) 209-6188<br><br>*Counsel for Defendants,*<br>*Velieta Direct (Seller ID:A2F6L2SBP8S37C),*<br>*Lingmou (Seller ID:A1I3QAV9AFU29B),*<br>*DIGINAVI E-LINK (HONG KONG) LIMITED,*<br>*DEAPRULL, and SOZT-US*<br>*Bluebow*<br><br>*OF COUNSEL:*<br><br>**Richard Liu, Esq.** (admitted *pro hac vice*)<br>richard.liu@consultils.com<br>**Jared Xu, Esq.** (admitted *pro hac vice*)<br>jared.xu@consultils.com<br>355 S. Grand Avenue, Suite 2450<br>Los Angeles, California 90071<br>Telephone: (626) 628-8894<br><br>*Counsel for Defendant,*<br>*DIGINAVI E-LINK (HONG KONG) LIMITED* |

| | |
|---|---|
| **Chengchen Xu, Esq.** (admitted *pro hac vice*)<br>cc.xu.iplaw@hotmail.com<br>418 Broadway #8555<br>Albany, New York 12207<br>Telephone: (858) 280-5570<br><br>*Counsel for Defendants,*<br>*IceSwirls, Tefoqu, Wongic, Dutepa, Auriswell*<br>*(on Amazon), Auriswell (on Walmart),*<br>*Kelteroom*<br>*-and-*<br>*Third Party Respondents,*<br>*Grano Chef, oplace, POFABIK, BLIZZEE,*<br>*NLNYA, Nyzgax* | |
| **Adrienne C. Love, Esq.**<br>alove@stearnsweaver.com<br>aruddock@stearnsweaver.com<br>vliethen@stearnsweaver.com<br>STEARNS WEAVER MILLER WEISSLER<br>ALHADEFF & SITTERSON, P.A.<br>106 East College Avenue, Suite 700<br>Tallahassee, Florida 32301<br>Telephone: (850) 580-7200<br><br>*OF COUNSEL*:<br><br>**Benjamin Bai, Esq.** (admitted *pro hac vice*)<br>benjamin.bai@cn.kwm.com<br>KING & WOOD MALLESONS, LLP<br>50th Floor, 500 Fifth Avenue<br>New York, New York 10110<br>Telephone(s): (212) 319-4755<br>           (+86) 21-2412-6097<br><br>**Haolu Feng, Esq.** (admitted *pro hac vice*)<br>harry.feng@cn.kwm.com<br>**Yang Guo, Esq.** (admitted *pro hac vice*)<br>guoyang5@cn.kwm.com<br>KING & WOOD MALLESONS, LLP<br>17F, One ICC, 999 Middle Huai Hai Road<br>Shanghai 200031 China<br>Telephone(s): (206) 499-2956<br>           (+86) 21-2412-6097 | **Mitchell Abood, Esq.**<br>mabood@pecklaw.com<br>CSemper@pecklaw.com<br>sbateman@pecklaw.com<br>KOConnor@pecklaw.com<br>Tao.Liu@glacier.law<br>wei.wang@glacierlaw.com<br>PECKAR & ABRAMSON, P.C.<br>One Southeast Third Avenue, Suite 2000<br>Miami, Florida 33131<br>Telephone: (305) 358-2600<br>Facsimile: (305) 375-0328<br><br>*Counsel for Defendants,*<br>*Ningbo Shangyou E-Commerce Co., Ltd., d/b/a*<br>*Wizaura, Hubei Zhihuigu Technology Co., Ltd.,*<br>*d/b/a Wizaura, Ningbo Linglingqi Cross-Border*<br>*E-Commerce Co., Ltd., d/b/a Wizaura, Dongdong*<br>*Century (Hangzhou) Technology Co., Ltd.,d/b/a*<br>*Syintao, Dongguan Shuhang Yilian (Hong Kong)*<br>*Co., Ltd.., d/b/a Haysky, Ningbo Qichui*<br>*Machinery Co., Ltd., d/b/a Roaaee, Changsha*<br>*Shuohang E-Commerce Co., Ltd., d/b/a Chivalz,*<br>*Anqing Xi'a Trading Co., Ltd., d/b/a Chivalz,*<br>*Zhongshan Jiameng Office Supplies Co., Ltd., .,*<br>*d/b/a Chivalz, Yantai Renqian E-Commerce Co.,*<br>*Ltd., d/b/a Roromall, Yantai Haiga Trading Co.,*<br>*Ltd., d/b/a Towallmark*<br>*Foshan Lihao Weida Technology Co., Ltd., d/b/a*<br>*UJR, and Shenzhen Junhan E-Commerce Co.,*<br>*Ltd., d/b/a Shakku* |

| | |
|---|---|
| *Counsel for Defendants,*<br>*Gasbye, Fohere, VNN, PAMBEE and WIE* | *and Third-Party Respondent Shenzhen*<br>*Manyangda Trading Co., Ltd., d/b/a Lavilys*<br><br>*OF COUNSEL*:<br><br>**Kevin J. O'Connor, Esq.** (*pro hac vice* pending)<br>koconnor@pecklaw.com<br>PECKAR & ABRAMSON, P.C.<br>70 Grand Avenue<br>River Edge, New Jersey 07661<br>Telephone:  (201) 343-3434<br><br><br><br>**Wei Wang, Esq.** (*pro hac vice* pending)<br>wei.wang@glacier.law<br>**Tao Liu, Esq.** (*pro hac vice* pending)<br>tao.liu@glacier.law<br>GLACIER LAW LLP<br>41 Madison Avenue, Suite 2529<br>New York, New York 10010<br>Telephone:  (212) 729-5073<br><br>*Counsel for Defendants,*<br>*Ningbo Shangyou E-Commerce Co., Ltd., d/b/a*<br>*Wizaura, Hubei Zhihuigu Technology Co., Ltd.,*<br>*d/b/a Wizaura, Ningbo Linglingqi Cross-Border*<br>*E-Commerce Co., Ltd., d/b/a Wizaura, Dongdong*<br>*Century (Hangzhou) Technology Co., Ltd.,d/b/a*<br>*Syintao, Ningbo Qichui Machinery Co., Ltd.,*<br>*d/b/a Roaaee, Changsha Shuohang E-Commerce*<br>*Co., Ltd., d/b/a Chivalz, Anqing Xi'a Trading Co.,*<br>*Ltd., d/b/a Chivalz, Zhongshan Jiameng Office*<br>*Supplies Co., Ltd., ., d/b/a Chivalz, Yantai*<br>*Renqian E-Commerce Co., Ltd., d/b/a Roromall,*<br>*Yantai Haiga Trading Co., Ltd., d/b/a*<br>*Towallmark*<br>*and Yantai Kongqueju E-Commerce Co., Ltd.,*<br>*d/b/a ExploreHorizon,*<br>*Ningbo Mengshu Furniture Co., Ltd., d/b/a Oylus,*<br>*Ningbo Petbobi Pet Products Co., Ltd. d/b/a* |

| | |
|---|---|
| | *Rellytech, and Ningbo Gaotong Business Service Co., Ltd., d/b/a FlameMore,*<br>*Dongguan Shenzhaodao Trading Co., Ltd., d/b/a Ezbasics*<br>*-and -*<br>*Third-Party Respondents,*<br>*Hangzhou Shuzhi Interactive Technology Co., Ltd., d/b/a WALKLINK, Yantai Zhirun E-Commerce Co., Ltd., d/b/a, Garvee and Fuzhou Mijia Electric Appliance Co., Ltd., d/b/a REVOTIO* |
| **Shanshan Liang, Esq.**<br>sliang@customscourt.com<br>lcosta@customscourt.com<br>LIANG + MOONEY, PLLC<br>2104 Delta Way, Suite 1<br>Tallahassee, FL 32303<br>Telephone:  (850) 893-0670<br>*OF COUNSEL*:<br><br>**Lance Y. Liu, Esq.** (admitted *pro hac vice*)<br>lanceliu2000@gmail.com<br>15 Minuteman Circle<br>Southbury, Connecticut 06488<br>Telephone:  (203) 706-9536<br><br>**Joseph A. Farco, Esq.** (admitted *pro hac vice*)<br>jfarco@bochner.law<br>BOCHNER PLLC<br>1040 Avenue of the Americas, 15th Floor<br>New York, New York 10018<br>Telephone:  (646) 971-0685<br><br>*Counsel for Defendants,*<br>*(1) Hewcham,*<br>*(2) Eastplus,*<br>*(3) Teendow*<br>*(4) VEVOR (Bestbuy),*<br>*(5) VEVOR (Walmart),*<br>*(6) VEVOR (Amazon)*<br>*(7) HCY Wholesale (Walmart),*<br>*(8) Amaxxo,*<br><br>*Third-Party Respondents,* | **Emily M. Heim, Esq.**<br>emilymarieheim540@gmail.com<br>emily@bayramoglu-legal.com<br>733 5th Ave. N., #3<br>St. Petersburg, Florida 33701<br>Telephone: (771) 777-8280<br><br>*OF COUNSEL:*<br><br>**Ude Lu, Esq.** (admitted *pro hac vice*)<br>ulu@pvipus.com<br>PV IP<br>6701 Democracy Boulevard, Suite 300<br>Bethesda, Maryland 20817<br>Telephone:  (301) 709-7703<br><br>**Donald R. McPhail, Esq.** (admitted *pro hac vice*)<br>dmcphail@vcip.us<br>VANGUARD CREST P.C.<br>1500 K Street NW, Suite 228<br>Washington, D.C.<br>Telephone:  (771) 777-8280<br><br>*Counsel for Defendants,*<br>*Shenzhen Fengkai Ecommerce Co., Ltd. and*<br>*Hong Kong Huayun Economic & Trade Co., Ltd.* |

| | |
|---|---|
| *(9) VEVOR Store Simplego,*<br>*(10) Eastplus-US*<br>*(11) Kitchen-Store USA,*<br>*(12) BloomMap,*<br>*(13) Vischic Direct,*<br>*(14) LINZHIKEJI,*<br>*(15) ZABINS,*<br>*(16) TATAANTY,*<br>*(17) TOKXTIK,*<br>*(18) LIAPOTT,*<br>*(19) CULVANI,*<br>*(20) Acaspresso,*<br><br>*Third-Party Respondent,*<br>*a TX entity and not on Schedule A.*<br>*(21) ZDINGQIN LLC* | |
| **Ricardo A. Ampudia, Esq.**<br>ricardo.ampudia@rimonlaw.com<br>eric.cohen@rimonlaw.com<br>mengmeng.luo@rimonlaw.com<br>RIMON, P.C.<br>333 SE 2 Avenue<br>Suite 2000<br>Miami, Florida 33131<br>Telephone:  (202) 991-1516<br><br>*Counsel for Defendant, Sunvivi* | |